*This opinion is subject to revision before final
publication in the Pacific Reporter*

**2013 UT 22**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

LISA PENUNURI and BARRY SIEGWART,
*Appellants,*

*v.*

SUNDANCE PARTNERS, LTD; SUNDANCE HOLDINGS, LLC;
SUNDANCE DEVELOPMENT CORP; ROBERT REDFORD;
REDFORD 1970 TRUST; ROCKY MOUNTAIN OUTFITTERS, L.C.;
and DOES I-X,
*Appellees.*

No. 20110565
Filed April 9,2013

Fourth District, Provo Dep't
The Honorable Claudia Laycock
No. 080400019

On Certiorari to the Utah Court of Appeals

Attorneys:

Robert D. Strieper, Salt Lake City, for appellants

H. Burt Ringwood, A. Joseph Sano, Salt Lake City, for appellees

CHIEF JUSTICE DURRANT authored the opinion of the Court,
in which ASSOCIATE CHIEF JUSTICE NEHRING,
JUSTICE DURHAM, and JUSTICE PARRISH joined.

JUSTICE LEE filed a concurring opinion.

CHIEF JUSTICE DURRANT, opinion of the Court:

## INTRODUCTION

¶1    Ms. Penunuri was injured while participating in a guided
horseback ride near Sundance Resort. Before the ride, she signed a
release (Waiver), in which she waived her right to sue Defendants
(collectively, Sundance) for injuries caused by Sundance's ordinary
negligence. In this appeal, Ms. Penunuri asks us to find that the
Waiver is unenforceable under the Limitations on Liability for

Equine and Livestock Activities Act (Equine Act)[1] and that it violates the public policy expressed in the Equine Act.

¶2    We first consider whether the Waiver is unenforceable under the Equine Act. We conclude that the Equine Act establishes no public policy that invalidates preinjury releases for ordinary negligence. Second, we consider whether the Equine Act is sufficiently similar to Utah's Inherent Risks of Skiing Act (Skiing Act)[2] such that the "public policy bargain" we inferred from the language of the Skiing Act in *Rothstein v. Snowbird Corp.*[3] similarly invalidates preinjury releases under the Equine Act. Because the Equine Act lacks the discussion of public policy contained in the Skiing Act, we decline to infer that the Equine Act was the result of a public policy bargain. Accordingly, we conclude that the Waiver is enforceable and does not violate public policy.

## BACKGROUND

¶3    On August 1, 2007, Ms. Penunuri participated in a guided horseback ride operated by Sundance. Before the ride began, Ms. Penunuri signed the Waiver. The Waiver explained that horseback riding involves "significant risk of serious personal injury," and that there are certain "inherent risks" associated with the activity, including "the propensity of the animal to behave in ways that may result in injury, harm, or death to persons on or around them." The Waiver also purported to release Sundance from liability for its ordinary negligence, providing as follows: "I expressly agree to assume all risks of personal injury, falls, accidents, and/or property damage, including those resulting from any negligence of [Sundance] . . . ."

¶4    The riding party consisted of five participants and one guide, arranged in single file with the guide in front and Ms. Penunuri in the rear. During the ride, a gap formed between Ms. Penunuri and the eight-year-old rider in front of her. After some

---

[1] UTAH CODE § 78B-4-201 to -203. Except where otherwise noted, we cite to the current version of the Utah Code in this opinion "because no substantive changes have been made to the relevant statutory provisions that would affect the resolution of the issues presented on appeal." *See State v. Maestas*, 2012 UT 46, ¶ 1 n.1, ___ P.3d ___.

[2] UTAH CODE § 78B-4-401 to -404.

[3] 2007 UT 96, ¶¶ 15–16, 175 P.3d 560.

of the riders asked the guide to slow down or stop to close the gap, the guide stated that she would hold the eight-year-old's reins to keep the train of horses together. But before she could do so, Ms. Penunuri's horse suddenly accelerated to close the gap and catch up with the other horses. Ms. Penunuri asserts that the sudden acceleration caused her to fall to the ground and that she suffered serious injuries as a result.

¶5 Ms. Penunuri sued Sundance, alleging negligence, gross negligence, and vicarious liability. She then filed a motion for partial summary judgment, arguing that the Waiver was unenforceable under the Equine Act. The district court denied her motion, finding that the Waiver was valid and enforceable. Accordingly, the court dismissed all of Ms. Penunuri's claims except her claim for gross negligence.

¶6 After the district court certified its order as final pursuant to rule 54(b) of the Utah Rules of Civil Procedure, Ms. Penunuri appealed. The court of appeals determined that the 54(b) certification was improper, but exercised its discretion to treat Ms. Penunuri's appeal as a petition for permission to appeal from an interlocutory order. The court permitted Ms. Penunuri to appeal, but ultimately affirmed the district court's ruling, concluding that the Waiver was valid and enforceable.[4] Specifically, the court concluded that neither the Equine Act nor public policy invalidates preinjury releases for horseback riding.[5]

¶7 Ms. Penunuri then filed a petition for writ of certiorari. We granted her petition to consider whether the court of appeals erred in construing the Equine Act to permit releases of liability for ordinary negligence. We have jurisdiction over this matter pursuant to section 78A-3-102(3)(a) of the Utah Code.

## STANDARD OF REVIEW

¶8 "On certiorari, we review the decision of the court of appeals, not the trial court."[6] And "[a]s the decision of the court of appeals rests on questions of statutory interpretation, we review it for correctness, affording no deference to the court of appeals' legal

---

[4] *Penunuri v. Sundance Partners, Ltd.*, 2011 UT App 183, ¶¶ 12–19, 257 P.3d 1049.

[5] *Id.*

[6] *Fla. Asset Fin. Corp. v. Utah Labor Comm'n*, 2006 UT 58, ¶ 8, 147 P.3d 1189 (internal quotation marks omitted).

conclusions."[7] Further, summary judgment is appropriate only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."[8]

## ANALYSIS

¶9    Section 202 of the Equine Act provides that equine activity sponsors[9] are not liable for injuries caused by the "inherent risks" associated with equine activities.[10] "Inherent risk" is defined under the Equine Act as "those dangers or conditions which are an integral part of equine or livestock activities," including, among other things, "the propensity of the animal to behave in ways that may result in injury" and "the unpredictability of the animal's reaction to outside stimulation."[11]

¶10    But section 202 does not completely eliminate an equine sponsor's liability. In relevant part, section 202 provides as follows:

> (2) An equine activity sponsor, equine professional, livestock activity sponsor, or livestock professional is not liable for an injury to or the death of a participant due to the inherent risks associated with these activities, *unless* the sponsor or professional:
>
> (a)(i) provided the equipment or tack;
>
> (ii) the equipment or tack caused the injury; and
>
> (iii) the equipment failure was due to the sponsor's or professional's negligence;
>
> (b) failed to make reasonable efforts to determine whether the equine or livestock could behave in a manner consistent with the activity with the participant;
>
> (c) owns, leases, rents, or is in legal possession and control of land or facilities upon which the partici-

---

[7] *Id.*

[8] UTAH R. CIV. P. 56(c).

[9] "Equine activity sponsor" is defined in the Equine Act as an individual or group "which sponsors, organizes, or provides facilities for an equine activity," including horseback riding. UTAH CODE § 78B-4-201(3).

[10] *Id.* § 78B-4-202(2).

[11] *Id.* § 78B-4-201(5).

pant sustained injuries because of a dangerous condition which was known to or should have been known to the sponsor or professional and for which warning signs have not been conspicuously posted;

(d)(i) commits an act or omission that constitutes negligence, gross negligence, or willful or wanton disregard for the safety of the particpant; and

   (ii) that act or omission causes the injury; or

(e) intentionally injures or causes the injury to the participant.[12]

¶11   While section 202 eliminates liability for the inherent risks of equine activities, section 203 requires sponsors to provide notice to participants that the sponsor is not liable for those risks.[13] Section 203 requires that the "[n]otice shall be provided" either by "posting a sign in a prominent location within the area being used for the activity" or by "providing a document or release for the participant, or the participant's legal guardian if the participant is a minor, to sign."[14]

¶12   Below, we first consider whether preinjury releases of liability for ordinary negligence are enforceable under the Equine Act. Second, we consider whether the public policy bargain we inferred from the language of the Skiing Act in *Rothstein*[15] should be similarly inferred from the language of the Equine Act, which would render preinjury releases of ordinary negligence unenforceable as violating public policy.

## I. THE EQUINE ACT DOES NOT INVALIDATE PREINJURY RELEASES OF LIABILITY FOR ORDINARY NEGLIGENCE

¶13   Ms. Penunuri argues that section 202 of the Equine Act prohibits a sponsor from using a preinjury release to escape liability

---

[12] *Id.* § 78B-4-202(2) (emphasis added).

[13] *Id.* § 78B-4-203(1) ("An equine or livestock activity sponsor shall provide notice to participants of the equine or livestock activity that there are inherent risks of participating and that the sponsor is not liable for certain of those risks.").

[14] *Id.* § 78B-4-203(2).

[15] *See Rothstein v. Snowbird Corp.*, 2007 UT 96, ¶¶ 15–16, 175 P.3d 560.

for its negligent acts.[16] She asserts that by protecting equine activity sponsors from liability arising out of the inherent risks associated with equine activities, the Legislature impliedly intended that they remain liable for all other claims. Ms. Penunuri also directs our attention to legislative debates that, she argues, support her interpretation of the statute. Further, while noting that section 203 mentions that a sponsor may provide a "release" for a participant to sign, Ms. Penunuri argues that the content of such a release must be limited to providing the notice required by that section.

¶14    The court of appeals concluded that reading section 202 to invalidate preinjury releases "stretches the statutory language past its plain meaning."[17] Instead, the court concluded that while "section 202 protects a sponsor from liability arising from the inherent risks of equine activities unless the sponsor is negligent . . . the sponsor remains free to assert all other applicable defenses, including, if appropriate, release."[18] Regarding section 203, the court declined Ms. Penunuri's invitation to read "'release' . . . to refer merely to a document notifying the participant that the sponsor is insulated against claims arising from certain inherent risks of participating in the activity."[19] The court concluded that "[b]ecause the statutory term 'document' already conveys this meaning, such a reading would impermissibly render 'release' redundant."[20] We agree.

¶15    When we interpret a statute, "our primary objective is to ascertain the intent of the legislature."[21] Because "[t]he best evidence of the legislature's intent is the plain language of the statute itself,"[22]

---

[16] Whether a preinjury release would be enforceable if it purported to release a sponsor's liability for gross negligence is not at issue in this appeal.

[17] *Penunuri v. Sundance Partners, Ltd.*, 2011 UT App 183, ¶ 13, 257 P.3d 1049.

[18] *Id.*

[19] *Id.* ¶ 14.

[20] *Id.*

[21] *Ivory Homes, Ltd. v. Utah State Tax Comm'n*, 2011 UT 54, ¶ 21, 266 P.3d 751.

[22] *Marion Energy, Inc. v. KFJ Ranch P'ship*, 2011 UT 50, ¶ 14, 267 P.3d 863 (internal quotation marks omitted).

we look first to the plain language of the statute.[23] "We presume that the legislature used each word advisedly and read each term according to its ordinary and accepted meaning."[24] "Additionally, we presume[] that the expression of one [term] should be interpreted as the exclusion of another," and "[w]e therefore seek to give effect to omissions in statutory language by presuming all omissions to be purposeful."[25] But we do not view individual words and subsections in isolation; instead, our statutory interpretation "requires that each part or section be construed in connection with every other part or section so as to produce a *harmonious whole*."[26] Thus, we "interpret[] statutes to give meaning to all parts, and avoid[] rendering portions of the statute superfluous."[27]

¶16    Further, "[w]hen the meaning of [a] statute can be discerned from its language, no other interpretive tools are needed."[28] Accordingly, it is only "when statutory language is ambiguous—in that its terms remain susceptible to two or more reasonable interpretations after we have conducted a plain language analysis"—that we "resort to other modes of statutory construction," such as legislative history.[29]

¶17    In this case, the Equine Act eliminates a sponsor's liability for injuries caused by risks that are inherent to equine activities, but retains sponsor liability for injuries that are caused in part by the sponsor's own negligence.[30] For example, a horse's "propensity . . . to behave in ways that may result in injury" to its rider is an "inherent risk" of horseback riding.[31] Consequently, under the Equine Act, if that propensity caused injury to a rider, the sponsor

---

[23] *Ivory Homes*, 2011 UT 54, ¶ 21.

[24] *Id.* (internal quotation marks omitted).

[25] *Marion Energy*, 2011 UT 50, ¶ 14 (first and second alterations in original) (internal quotation marks omitted).

[26] *Ivory Homes*, 2011 UT 54, ¶ 21 (internal quotation marks omitted).

[27] *LKL Assocs., Inc. v. Farley*, 2004 UT 51, ¶ 7, 94 P.3d 279.

[28] *Marion Energy*, 2011 UT 50, ¶ 15 (second alteration in original) (internal quotation marks omitted).

[29] *Id.*

[30] UTAH CODE § 78B-4-202(1)–(2).

[31] *See id.* § 78B-4-201(5)(a).

would generally not be liable.[32] But if the injuries occurred after the sponsor "failed to make reasonable efforts to determine whether the [horse] could behave in a manner consistent with" horseback riding, then the sponsor would remain liable under the Equine Act.[33] Thus, the Equine Act eliminates a participant's ability to recover damages for injuries resulting from the inherent risks of equine activities unless the injuries resulted from a sponsor's negligence.

¶18 But the fact that the Equine Statute does not eliminate a sponsor's liability for negligence does not mean that the Legislature intended to invalidate preinjury waivers for ordinary negligence. In other words, "[n]owhere does the text suggest that [equine sponsors] may not contractually further limit their liability for risks that are not inherent" to equine activities.[34]

¶19 Indeed, in other contexts, the Legislature has expressly invalidated particular contractual waivers, stating that they are "void and unenforceable" as contrary to public policy.[35] But the Equine Act contains no such expression. We "give effect" to this omission "by presuming [it] to be purposeful,"[36] and conclude that the Equine Act does not invalidate preinjury releases of liability for ordinary negligence.

¶20 This conclusion is supported by the Legislature's use of the word "release" in section 203. Specifically, section 203 requires that sponsors "provide notice to participants . . . that there are inherent risks of participating and that the sponsor is not liable for certain of

---

[32] *See id.* § 78B-4-202(2).

[33] *Id.* § 78B-4-202(2)(b).

[34] *See Rothstein v. Snowbird Corp.*, 2007 UT 96, ¶ 26, 175 P.3d 560 (Wilkins, J., dissenting).

[35] *E.g.*, UTAH CODE § 78B-6-707 ("Any clause in a sales contract or collateral document that requires a purchaser or end user of a product to indemnify, hold harmless, or defend a manufacturer of a product is contrary to public policy and void and unenforceable if a defect in the design or manufacturing of the product causes an injury or death."); *id.* § 13-8-1(2) (Except in enumerated circumstances, "an indemnification provision in a construction contract is against public policy and is void and unenforceable.").

[36] *See Marion Energy*, 2011 UT 50, ¶ 14.

those risks."[37] Further, the statute requires that the "[n]otice shall be provided by" either "posting a sign in a prominent location," or "providing a document or *release* for the participant, or the participant's legal guardian if the participant is a minor, to sign."[38]

¶21    We do not read "release" to refer merely to a document that provides the required notice. As the court of appeals noted, "[b]ecause the statutory term 'document' already conveys this meaning, such a reading would impermissibly render 'release' redundant."[39] Further, "a release does more than provide notice."[40] A release is "[t]he relinquishment or concession of a right . . . or claim."[41] Thus, if we were to adopt Ms. Penunuri's reading, the statute would permit a participant to "release" a right which she does not have under the Equine Act—a right to recover for injuries caused by the inherent risks of horseback riding. Instead, we read "release" to have its "ordinary and accepted meaning."[42] Thus, we conclude that the statute contemplates that equine sponsors might seek preinjury releases from participants.[43]

¶22    We conclude that the statute is unambiguous. Thus, we decline to consider "other modes of statutory construction,"

---

[37] UTAH CODE § 78B-4-203(1).

[38] *Id.* § 78B-4-203(2) (emphasis added).

[39] *Penunuri*, 2011 UT App 183, ¶ 14.

[40] *Id.*

[41] BLACK'S LAW DICTIONARY 1403 (9th ed. 2009).

[42] *See Ivory Homes*, 2011 UT 54, ¶ 21 (internal quotation marks omitted).

[43] Section 203 permits a parent to sign a "release" on behalf of a minor. UTAH CODE § 78B-4-203(2)(b). But in *Hawkins ex rel. Hawkins v. Peart*, we held that a parent's preinjury release of a minor's claim is unenforceable as a violation of public policy. 2001 UT 94, ¶¶ 10–11, 37 P.3d 1062. Thus, Ms. Penunuri argues that the statute makes sense only if "release" cannot include a preinjury release. But although the Equine Act was enacted in 1993, the notice requirement was not added until 2003. *See* UTAH CODE § 78-27b-101 to 102 (1993); UTAH CODE § 78-27b-101 (2003). Thus, the statutory language permitting a parent to sign a release on behalf of a minor was added two years after we issued our opinion in *Hawkins*. Accordingly, to the extent the Equine Act conflicts with *Hawkins*, the Equine Act would control and effectively overrule our conclusion in *Hawkins*.

including legislative history.[44] And ultimately, we adopt the reasoning expressed by the court of appeals: although "section 202 protects a sponsor from liability arising from the inherent risks of equine activities unless the sponsor is negligent . . . the sponsor remains free to assert all other applicable defenses, including, if appropriate, release."[45] We therefore conclude that the Equine Act does not invalidate preinjury releases of liability for ordinary negligence.

## II. PREINJURY RELEASES DO NOT VIOLATE PUBLIC POLICY UNDER THE EQUINE ACT

¶23    Ms. Penunuri argues that the Waiver is unenforceable as a violation of public policy. Specifically, she argues that the Equine Act was modeled after—and enacted for the same purpose as—the Skiing Act.[46] Relying on *Rothstein v. Snowbird Corp.,* in which we invalidated a preinjury release as a violation of the public policy expressed in the Skiing Act,[47] Ms. Penunuri argues that preinjury releases are similarly unenforceable under the Equine Act.

¶24    The court of appeals concluded that preinjury releases do not violate public policy under the Equine Act. The court began with a thorough analysis of our *Rothstein* decision, noting that our analysis was grounded in the public policy expressed by the Legislature in the first section of the Skiing Act.[48] Because "[t]he Equine Act has no equivalent statement of public policy," the court concluded that preinjury releases do not violate public policy under the Equine Act.[49] We agree.

¶25    It is well settled that preinjury releases of claims for ordinary negligence can be valid and enforceable.[50] Indeed, "[w]e have joined the majority of jurisdictions in permitting people to surrender their rights to recover in tort for the negligence of

---

[44] *See Marion Energy*, 2011 UT 50, ¶ 15.

[45] *Penunuri*, 2011 UT App 183, ¶ 13.

[46] *See* UTAH CODE § 78B-4-401 to -404.

[47] 2007 UT 96, ¶¶ 15–16, 175 P.3d 560.

[48] *Penunuri v. Sundance Partners, Ltd.*, 2011 UT App 183, ¶¶ 17–18, 257 P.3d 1049 (citing *Rothstein*, 2007 UT 96).

[49] *Id.* ¶ 19.

[50] *Rothstein*, 2007 UT 96, ¶ 6.

others."[51] But "preinjury releases are not unlimited in power and can be invalidated in certain circumstances."[52] Specifically, "(1) releases that offend public policy are unenforceable; (2) releases for activities that fit within the public interest exception[53] are unenforceable; and (3) releases that are unclear or ambiguous are unenforceable."[54] In this case, Ms. Penunuri does not argue that the Waiver is ambiguous or that horseback riding constitutes a public interest. Thus, we consider only whether the Waiver is unenforceable as a violation of public policy.[55]

¶26 To determine whether a contract offends public policy, we first determine whether an established public policy has been expressed in either constitutional or statutory provisions or the

---

[51] *Id.*

[52] *Pearce v. Utah Athletic Found.*, 2008 UT 13, ¶ 14, 179 P.3d 760.

[53] Though similar in name, an analysis of the public policy exception and an analysis of the public interest exception begin at different points and require different considerations. Specifically, to determine whether an exculpatory provision is contrary to public policy, we first determine whether a public policy has been established in the common law or in constitutional or statutory provisions. *See Rackley v. Fairview Care Ctrs., Inc.*, 2001 UT 32, ¶ 16, 23 P.3d 1022; *see also infra* ¶ 26 n.55. On the other hand, to determine whether an exculpatory provision is invalid under the public interest exception, we consider a variety of aspects of the contract, including whether "[t]he party seeking exculpation is engaged in performing a service of great importance to the public," and whether, "[a]s a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services." *Pearce*, 2008 UT 13, ¶ 17 (internal quotation marks omitted).

[54] *Pearce*, 2008 UT 13, ¶ 14 (citations omitted).

[55] Although the Utah Association for Justice argues in its amicus brief that preinjury releases violate the public interest, it is a "well-settled rule that an amicus brief cannot extend or enlarge the issues on appeal," and that we will "only consider[] those portions of the amicus brief that bear on the issues pursued by the parties to th[e] appeal." *Madsen v. Borthick*, 658 P.2d 627, 629 n.3 (Utah 1983). Accordingly, we decline to consider whether the Waiver is ambiguous or violates the public interest.

common law.[56] We have held that "[f]or a contract to be void on the basis of public policy, there must be a showing free from doubt that the contract is against public policy."[57] But "the term 'public policy' is so broad in the abstract that it eludes a reasonably precise definition for legal purposes."[58] And we have noted that "[t]o pluck a principle of public policy from the text of a statute and to ground a decision of this court on that principle is to invite judicial mischief."[59] Accordingly, we have held that "the theory of public policy embodies a doctrine of vague and variable quality, and, unless deducible in the given circumstances from constitutional or statutory provisions, should be accepted as the basis of a judicial determination, if at all, only with the utmost circumspection."[60]

¶27    In some instances, the Legislature unequivocally expresses its view that certain contractual provisions are unenforceable as against public policy. For example, section 78B-6-707 of the Utah Code provides that "[a]ny clause . . . that requires a purchaser or end user of a product to indemnify, hold harmless, or defend a manufacturer of a product is contrary to public policy and void and unenforceable." Similarly, section 13-8-1(2) of the Utah Code provides that "an indemnification provision in a construction contract is against public policy and is void and unenforceable" except in specific circumstances.

---

[56] *See Rothstein*, 2007 UT 96, ¶ 20 (relying on the Legislature's explicit statement of public policy in the Skiing Act to conclude that a ski resort could not enforce a   preinjury release of a skier's negligence claims against a ski resort); *Hawkins ex rel. Hawkins v. Peart*, 2001 UT 94, ¶¶ 10–12, 37 P.3d 1062 (relying on the public policy expressed in various provisions of the Utah Code as well as by a "clear majority of courts")*; Berube v. Fashion Ctr., Ltd.*, 771 P.2d 1033, 1043 (Utah 1989) (noting that public policy may be found in constitutional or statutory provisions, as well as judicial pronouncements); *see also Rackley*, 2001 UT 32, ¶ 16 (noting that in the employment-at-will context, "public policy is 'clear' if it is plainly defined by one of three sources: (1) legislative enactments; (2) constitutional standards; or (3) judicial decisions").

[57] *Ockey v. Lehmer*, 2008 UT 37, ¶ 21, 189 P.3d 51 (internal quotation marks omitted).

[58] *Fox v. MCI Commc'ns Corp.*, 931 P.2d 857, 860 (Utah 1997).

[59] *Rothstein*, 2007 UT 96, ¶ 10.

[60] *Berube*, 771 P.2d at 1043 (quoting *Patton v. United States*, 281 U.S. 276, 306 (1930)).

¶28　In the absence of this sort of statutory language, we have looked to public policy expressed in the common law or suggested by the statutory text. For example, in *Hawkins ex rel. Hawkins v. Peart*, we looked to public policy suggested by various provisions of the Utah Code when we considered the enforceability of a preinjury release signed by a mother on behalf of her minor daughter.[61] In concluding that the release was unenforceable, we relied on a "public policy exception" indicated by Utah statues and rules that "provides various checks on parental authority to ensure a child's interests are protected" and indicate "public policies favoring protection of minors with respect to contractual obligations."[62] Further, we noted that "[a] clear majority of courts treating the issue have held that a parent may not release a minor's prospective claim for negligence."[63] Specifically, we agreed that "[s]ince a parent generally may not release a child's cause of action after injury, it makes little, if any, sense to conclude a parent has authority to release a child's cause of action prior to an injury."[64]

¶29　And in *Rothstein*, we looked to public policy expressed in the statute itself when we considered the enforceability of a preinjury release signed by a skier.[65] The preinjury release at issue waived the skier's right to recover damages arising from "the risks of skiing or from any other cause *including the negligence*" of the ski resort.[66] Turning to the language of the Skiing Act, we concluded that by waiving the resort's liability for negligence, the release "breached [the] public policy bargain" struck by the statute.[67] And although the Skiing Act does not mention preinjury releases for negligence, we concluded that "[f]ew legislative expressions of public policy speak more clearly to an issue . . . than the public policy rationale for [the Skiing Act] speaks to preinjury releases for negligence."[68]

---

[61] 2001 UT 94, ¶¶ 1, 11–12.

[62] *Id.* ¶¶ 10–12.

[63] *Id.* ¶ 10.

[64] *Id.* (alteration in original) (internal quotation marks omitted).

[65] *Rothstein*, 2007 UT 96, ¶ 1.

[66] *Id.* ¶ 4 (internal quotation marks omitted).

[67] *Id.* ¶ 16.

[68] *Id.* ¶ 11.

¶30    The first section of the Skiing Act is entitled "Public Policy" and provides as follows:

> The Legislature finds that the sport of skiing is practiced by a large number of residents of Utah and attracts a large number of nonresidents, significantly contributing to the economy of this state. It further finds that few insurance carriers are willing to provide liability insurance protection to ski area operators and that the premiums charged by those carriers have risen sharply in recent years due to confusion as to whether a skier assumes the risks inherent in the sport of skiing. It is the purpose of this act, therefore, to clarify the law in relation to skiing injuries and the risks inherent in that sport, to establish as a matter of law that certain risks are inherent in that sport, and to provide that, as a matter of public policy, no person engaged in that sport shall recover from a ski operator for injuries resulting from those inherent risks.[69]

¶31    Based upon this language, we concluded that the "central purpose of the Act . . . was to permit ski area operators to purchase insurance at affordable rates."[70] Additionally, we concluded that the statutory language evidenced a bargain struck by the Legislature: by removing liability for the inherent risks of skiing, ski area operators could purchase cheaper insurance, and in exchange, they would be *required* to retain liability for risks that are not inherent to skiing.[71] In light of this bargain, we concluded that the Legislature intended to prohibit preinjury releases. Specifically, we held that "[b]y expressly designating a ski area operator's ability to acquire insurance at reasonable rates as the sole reason" for enacting the Skiing Act, "the Legislature authoritatively put to rest the question of whether ski area operators are at liberty to use preinjury releases to significantly pare back or even eliminate their need to purchase the very liability insurance the Act was designed to make affordable. They are not."[72]

---

[69] UTAH CODE § 78B-4-401.

[70] *Rothstein*, 2007 UT 96, ¶ 15.

[71] *Id.* ¶ 16.

[72] *Id.* The dissent, however, concluded that the statute expressed no such bargain. *Id.* ¶ 26 (Wilkins, J., dissenting). Instead, the dissent asserted that the statute "simply proscribes lawsuits against ski area

(continued...)

¶32 In this case, the Equine Act is silent regarding public policy. Indeed, neither "public policy" nor any similar phrase appears in any section of the Act. Accordingly, because a public policy is not "deducible . . . from constitutional or statutory provisions," we may infer a public policy in the Equine Act "if at all, only with the utmost circumspection."[73] But unlike the Skiing Act, the Equine Act does not explain the motivation behind the Legislature's decision to eliminate liability for inherent risks for equine activities. Further, the Equine Act contains no statement regarding the importance of equine activities on the tourism industry or the difficulty equine sponsors face in purchasing insurance at affordable rates.

¶33 Thus, we cannot conclude that the "central purpose" of the Equine Act was to permit equine sponsors "to purchase insurance at affordable rates."[74] And as discussed above, it was that "central purpose" of the Skiing Act, as expressed by the Legislature, that led us to infer that the Legislature had struck a "public policy bargain" when it eliminated liability for the inherent risks of skiing.[75] But there is not a similar expression of purpose in the Equine Act, and we "resist the temptation to add language or meaning to the Act where no hint of it exists in the text."[76] We cannot infer that, by removing liability for the inherent risks of equine activities, the Legislature intended that equine sponsors be precluded from escaping liability for their negligent acts. We therefore conclude that preinjury waivers for ordinary negligence do not violate public policy under the Equine Act.

**CONCLUSION**

---

[72] (...continued)
operators for those risks that are inherent to skiing. Nowhere does the text suggest that ski area operators may not contractually further limit their liability for risks that are not inherent to skiing. In fact, the text is silent about whether an individual may or may not sue a ski area operator on some other basis." *Id.* (citation omitted). Accordingly, the dissent concluded that we should "resist the temptation to add language or meaning to the Act where no hint of it exists in the text." *Id.*

[73] *See Berube*, 771 P.2d at 1043 (quoting *Patton*, 281 U.S. at 306).

[74] *See Rothstein*, 2007 UT 96, ¶ 15.

[75] *Id.* ¶¶ 15–16.

[76] *Id.* ¶ 26 (Wilkins, J., dissenting).

JUSTICE LEE: concurring in part,
concurring in the judgment

¶34 We conclude that the Equine Act does not invalidate preinjury releases for ordinary negligence. Further, we conclude that the Equine Act does not evidence a public policy bargain struck by the Legislature, and that our rationale in *Rothstein* is inapplicable to the Equine Act. Accordingly, we conclude that the Waiver is enforceable, and we affirm the decision of the court of appeals.

————————

JUSTICE LEE, concurring in part, concurring in the judgment:

¶35 I write separately only to note my disagreement with *Rothstein v. Snowbird Corp.*, 2007 UT 96, 175 P.3d 560, which the majority restates and then distinguishes. I see no logical or legal basis for *Rothstein*'s conclusion that enforcement of a ski resort's release waiving liability for negligence "breached [the] public policy bargain" struck by the Inherent Risks of Skiing Act, UTAH CODE §§ 78B-4-401 to -404. *Rothstein*, 2007 UT 96, ¶ 16. Even if the "central purpose" of that statute was to "permit ski area operators to purchase insurance at affordable rates," it could hardly follow that "the Legislature [thereby] authoritatively" renounced the enforceability of written waivers of liability for negligence. *Id.* ¶¶ 15–16. Enforcement of such releases could only further advance the stated goal—making insurance even more affordable. I would therefore repudiate *Rothstein* instead of distinguishing it in a manner that tends to reinforce it.

————————