**2022 UT App 126**

## THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF A.G., J.K., AND D.K.,
PERSONS UNDER EIGHTEEN YEARS OF AGE.

S.A.,
Appellant,
*v.*
STATE OF UTAH,
Appellee.

Opinion
No. 20210914-CA
Filed November 10, 2022

Third District Juvenile Court, Salt Lake Department
The Honorable Mark W. May
No. 1189413

Julie J. Nelson and Mark R. Anderson,
Attorneys for Appellant

Sean D. Reyes, Carol L.C. Verdoia, and John M.
Peterson, Attorneys for Appellee

Martha Pierce, Guardian ad Litem

JUDGE RYAN M. HARRIS authored this Opinion, in which JUDGE
GREGORY K. ORME and SENIOR JUDGE KATE APPLEBY concurred.[1]

HARRIS, Judge:

¶1      This case requires us to determine whether, under the
language of the governing statute, parents who intend to
relinquish their parental rights in connection with a child welfare
proceeding may effectuate that relinquishment under oath orally

---

1. Senior Judge Kate Appleby sat by special assignment as
authorized by law. *See generally* Utah R. Jud. Admin. 11-201(7).

in court, without ever signing anything, or whether they must at some point sign a document effectuating that relinquishment.

¶2 In this case, S.A. (Mother)—while under oath—told the juvenile court that she wanted to relinquish her parental rights to A.G., J.K., and D.K. (collectively, the Children), and that she was doing so knowingly and voluntarily. Relying on those sworn representations, the court accepted Mother's relinquishment, and later entered an order terminating Mother's parental rights. But Mother did not sign any document indicating that she was relinquishing her rights, and on that basis she challenged her relinquishment as incomplete and invalid. The juvenile court rejected that challenge, interpreting the governing statute as allowing relinquishment, under certain circumstances, without a signed document from the parent.

¶3 Mother now appeals that determination, asserting that the juvenile court's interpretation of the governing statute was incorrect. We agree with Mother that the statute requires the relinquishing parent to—at some point—sign a document effectuating the relinquishment. Accordingly, we reverse the termination order and remand this case for further proceedings.

BACKGROUND

¶4 In 2020, while the Children were living with Mother, the Division of Child and Family Services received a referral indicating that the Children might be endangered in Mother's care. Based on, among other things, items that were found at the home after a search, the State filed a petition seeking to take custody of the Children, and later filed a petition seeking to terminate Mother's parental rights.

¶5 Eventually, the juvenile court set a date for the termination trial, and the parties stipulated that the trial would occur virtually, using a videoconference platform. When the day for trial arrived,

the parties appeared on the virtual platform and informed the court that a trial would not be necessary because "a resolution had been reached" in which Mother "was going to voluntarily relinquish her parental rights." The court's clerk then administered an oath to Mother, and Mother's attorney (Counsel) began to ask Mother questions intended to shed light on whether Mother truly intended to knowingly and voluntarily relinquish her parental rights. The context of some of these questions indicates that the parties had planned for Mother to sign a document effectuating her relinquishment. For instance, Counsel asked Mother to confirm that they had "had the chance to talk about" the document Mother was "intending to sign today," and Mother indicated that they had.

¶6     After a few preliminary questions, however, Mother referred to the possibility that there had been an "agreement" for an "open adoption." At that point, Counsel asked for a recess to confer with Mother off the record in a separate "chatroom," which request the court granted.

¶7     A few minutes later, Mother and Counsel returned to the virtual courtroom, and the court went back on the record. Counsel resumed asking Mother questions, and Mother stated that she intended to relinquish her parental rights to the Children, that no one was forcing her to do so, and that she understood that her relinquishment would be "irrevocable and [could not] be changed upon signature." The court then followed up with some questions of its own, asking Mother whether she was "doing this of her own free will," and the following exchange occurred:

> Mother:     Of course, of my own free will. I agree to relinquish my rights as an open adoption would occur; if that makes sense.
>
> The Court: No. There's no condition of an open adoption.

| | |
|---|---|
| Mother: | So is this not going to be an open adoption? |
| Counsel: | [Mother], we've discussed this. |
| The Court: | There is no requirement for an open adoption. That is entirely up to the foster parents. |
| Mother: | Okay. |
| The Court: | You understand that? |
| Mother: | Yeah. |
| The Court: | And you're still willing to proceed today? |
| Mother: | Yeah. |

¶8    The court then solicited input from the State and the guardian ad litem (the GAL) as to whether Mother's relinquishment would be in the best interest of the Children. They each agreed that it would. At the conclusion of the hearing, the court stated that it would "accept [Mother's] voluntary relinquishment of parental rights," and asked Counsel to prepare an order to that effect. Mother did not sign any document during the hearing while in the (virtual) presence of the court; apparently the intent was for Mother to affix her signature to a relinquishment document at some point after the hearing.

¶9    Later that same day, however, Counsel filed a motion—apparently stipulated by all parties—for an expedited in-person hearing, explaining that he had "just been informed that we are unable to obtain [Mother's] signature" on the relinquishment document that the parties had envisioned her signing. After reviewing the motion, the court agreed to hold a hearing two

days later, but ordered that it be held virtually rather than in-person.

¶10 At the hearing, Counsel appeared on Mother's behalf and asked the court to set aside the relinquishment and reschedule the termination trial. Counsel informed the court that Mother was "now claiming that she was lied to in order to sign or to agree" to relinquishment, and was asserting that "an open adoption had been promised to her," a promise that Counsel stated "did not occur through" him. On this basis, Mother was refusing to sign any document effectuating her relinquishment.

¶11 The court noted that Mother and Counsel had taken a break during the previous hearing to discuss the open adoption issue, and that, after the break, the court had asked Mother questions "specifically on that very issue"; the court also recalled that Mother indicated, in response, that she understood "there was no agreement whatsoever" regarding an open adoption. The court concluded that, for these reasons, it "[didn't] find that [Mother's] position is credible." It also noted that, under its interpretation of the governing statute, it "[didn't] need . . . [Mother] to sign anything for [a] voluntar[y] relinquishment." After hearing briefly from the State and the GAL, the court denied Mother's motion to set aside the relinquishment, again noting that Mother had "voluntarily relinquished her parental rights" and that it "[didn't] need her signature." The court later signed a written order denying Mother's motion, as well as an order terminating Mother's parental rights to the Children.

ISSUE AND STANDARD OF REVIEW

¶12 Mother now appeals the order terminating her parental rights, asserting that the termination was invalid because she never signed any relinquishment document. In particular, she contends that the governing statute "requires a signature when a parent wishes to voluntarily relinquish their parental rights." The

question Mother poses is, at root, one of statutory interpretation, and in that context we review a trial court's decisions "for correctness, affording no deference to [its] legal conclusions." *See In re Childers-Gray*, 2021 UT 13, ¶ 14, 487 P.3d 96.[2]

_____

2. Near the beginning of its brief, the State asserts, in a footnote, that it is "not entirely clear" whether Mother's argument was preserved because "at no time did Mother argue" to the juvenile court that the absence of a signed document "rendered the relinquishment invalid." But the entire premise of Mother's motion to set aside the relinquishment was that she had refused to sign the document, and the juvenile court clearly understood Mother's motion to be raising the question of whether the statute required a signature. Even the State acknowledges that "the juvenile court seemed to recognize that such an argument was at least implicitly raised" by Mother's motion. Indeed, the court made its position clear on the statutory interpretation question, twice offering its view that the statute required no signature. Under circumstances like these, the question is preserved for our review. *See Cove at Little Valley Homeowners Ass'n v. Traverse Ridge Special Service Dist.*, 2022 UT 23, ¶ 28, 513 P.3d 658 (determining that, where "the district court ruled on the precise issue that the appellant wanted to assert on appeal," that issue was preserved for appellate review).

For its part, the GAL argues that Mother "invited [any] error" because she asked the court to postpone the scheduled trial and consider the matter of her relinquishment, and because she asked for a virtual hearing and indicated at that hearing that she intended to relinquish. While these facts are certainly true, they do not constitute invited error in this case. The alleged error here is the juvenile court's conclusion that the governing statute does not require Mother's signature, and at no point did Mother suggest to the court that no signature was required; as noted, at all times both Mother and Counsel appeared to presume that Mother would sign a document effectuating her relinquishment.

ANALYSIS

¶13 We begin our analysis by setting forth the first four subsections of the governing statute:

(1) The individual consenting to termination of parental rights or voluntarily relinquishing parental rights shall *sign or confirm the consent or relinquishment under oath* before:

(a) a judge of any court that has jurisdiction over proceedings for termination of parental rights in this state or any other state, or a public officer appointed by that court for the purpose of taking consents or relinquishments; or

(b) except as provided in Subsection (2), any person authorized to take consents or relinquishments under Subsections 78B-6-124(1) and (2).

(2) Only the juvenile court is authorized to take consents or relinquishments from a parent who has any child who is in the custody of a state agency or who has a child who is otherwise under the jurisdiction of the juvenile court.

(3) The court, appointed officer, or other authorized person shall certify to the best of that person's information and belief that the individual *executing the consent or relinquishment* has read and understands the consent or relinquishment and has *signed the consent or relinquishment* freely and voluntarily.

> (4) A voluntary relinquishment or consent for
> termination of parental rights is effective when *the*
> *voluntary relinquishment or consent is signed* and may
> not be revoked.

Utah Code Ann. § 80-4-307 (LexisNexis Supp. 2022) (emphases added). Thus, to summarize, all relinquishments regarding children "in the custody of a state agency" or "under the jurisdiction of the juvenile court" must involve a juvenile court judge. *See id.* § 80-4-307(2). A parent who is relinquishing rights to any such children must "sign or confirm the consent or relinquishment under oath before" that judge. *Id.* § 80-4-307(1). The judge, in turn, must "certify to the best of [his or her] information and belief" that the parent who is "executing the consent or relinquishment" understands it and has "signed [it] freely and voluntarily." *Id.* § 80-4-307(3). And the relinquishment "is effective when the voluntary relinquishment or consent is signed." *Id.* § 80-4-307(4).

¶14    The parties advance competing interpretations of these provisions. Mother interprets them as requiring a relinquishing parent to sign a document effectuating the relinquishment, and takes the position that, if no such document is signed by the parent, the relinquishment never becomes effective. The State and the GAL—as well as the juvenile court—espouse a different interpretation. In their view, subsection (1) provides two different pathways by which parents can relinquish their rights: parental relinquishments "may *either* be submitted in writing *or* confirmed under oath" before the court, and they assert that this second option allows relinquishment to occur without the necessity of a signed document. As they see it, the statute certainly allows parents to effectuate their relinquishment by signing a document, but they interpret the statute's first subsection as allowing an alternative pathway: parents may appear before a juvenile court judge and "confirm . . . under oath" their consent to termination of parental rights. For the reasons that follow, we conclude that

Mother's interpretation is correct, because it is the only one that gives meaning to all the statute's provisions.

¶15    The question presented is one of statutory interpretation. "When we interpret a statute, our primary objective is to ascertain the intent of the legislature." *Penunuri v. Sundance Partners, Ltd.*, 2013 UT 22, ¶ 15, 301 P.3d 984 (quotation simplified). "Because the best evidence of the legislature's intent is the plain language of the statute itself," we start our inquiry by examining that language. *Id.* (quotation simplified). In so doing,

> we presume that the legislature used each word advisedly and read each term according to its ordinary and accepted meaning. Additionally, we presume that the expression of one term should be interpreted as the exclusion of another, and we therefore seek to give effect to omissions in statutory language by presuming all omissions to be purposeful. But we do not view individual words and subsections in isolation; instead, our statutory interpretation requires that each part or section be construed in connection with every other part or section so as to produce a harmonious whole. Thus, we interpret statutes to give meaning to all parts, and avoid rendering portions of the statute superfluous.

*Id.* (quotation simplified). "When the meaning of a statute can be discerned from its language, no other interpretive tools are needed," and our inquiry is at an end. *Marion Energy, Inc. v. KFJ Ranch P'ship*, 2011 UT 50, ¶ 15, 267 P.3d 863 (quotation simplified); *see also Torrie v. Weber County*, 2013 UT 48, ¶ 11, 309 P.3d 216 (stating that when the statute "provides a workable result, we need not resort to other interpretive tools, and our analysis ends"). In this case, we can resolve the statutory interpretation question through examination of the statute's plain

language, and therefore we need not resort to other interpretive methods.[3]

¶16　The strength of Mother's interpretation is found in subsections (3) and (4) of the statute, which both reference—and seem to take as a given—the existence of a relinquishment document signed by the parent. Indeed, subsection (3) requires the person taking the relinquishment to "certify" that the parent "executing the consent or relinquishment has read and understands the consent or relinquishment and has signed" it "freely and voluntarily." *See* Utah Code Ann. § 80-4-307(3). It is of course difficult to "read and understand[]" (and then sign) something that is not written down in documentary form. And subsection (4) states flatly that a relinquishment "is effective when the voluntary relinquishment or consent is signed." *Id.* § 80-4-307(4). As Mother sees it, these two subsections do not make

---

3. For instance, our resolution of this appeal by analysis of the statutory text makes it unnecessary for us to consider what might have motivated our legislature, in 2000, to amend a similar statute in the adoption code to remove similar "or confirm" language, *see* Act of Mar. 13, 2000, ch. 171, § 2, 2000 Utah Laws 593, 594 (amending Utah Code section 78-30-4.18, now codified at Utah Code Ann. § 78B-6-124 (LexisNexis Supp. 2022)), while not making a similar amendment to the statute at issue here, even though it did make other changes to that statute that year, *see* Act of Mar. 13, 2000, ch. 161, § 17, 2000 Utah Laws 558, 568 (amending Utah Code section 78-3a-414, now codified at Utah Code Ann. § 80-4-307 (LexisNexis Supp. 2022)). The State and the GAL assert that this statutory history is indicative of a purposeful legislative choice to preserve a non-signatory option in the child welfare termination statute, while Mother asserts that this history reveals, at most, only a legislative "oversight." In our view, the text of the governing statute compels the result we reach in this appeal, regardless of what our legislature's motivations might have been as concerns its 2000 amendments.

sense, on their face, unless our legislature intended for parents to sign a document effectuating their relinquishment.

¶17 The State and the GAL counter by pointing to the language in subsection (1) stating that the relinquishing parent "shall sign *or confirm*" the relinquishment "under oath before" the person taking the relinquishment; in child welfare cases, that person is always a juvenile court judge. *See id.* § 80-4-307(1)–(2) (emphasis added). The State and the GAL interpret this language as providing an alternative non-signatory path to relinquishment, in which parents may appear before a juvenile court judge and "confirm" under oath their intention to relinquish parental rights. They assert that the words "or confirm" have no meaning if the statute is construed to require a signed document. They acknowledge the language in subsections (3) and (4) that seemingly envisions a signature, but they assert that subsection (3) is "vestigial" and should be interpreted to apply only to those situations (presumably involving children not in the child welfare system) where a relinquishment is taken by someone other than a judge. And they assert that subsection (4) refers to the *court's* signature on the ultimate termination document, rather than to the *parent's* signature on a relinquishment document. We find these arguments to be unpersuasive and at odds with the statutory text, for the following reasons.

¶18 First, we disagree with the State and the GAL when they assert that the words "or confirm" are rendered meaningless under Mother's interpretation. In interpreting the statute, "we do not view individual words and subsections in isolation," but instead construe each part "in connection with every other part or section so as to produce a harmonious whole." *Penunuri*, 2013 UT 22, ¶ 15 (quotation simplified); *see also Monarrez v. Utah Dep't of Transp.*, 2016 UT 10, ¶ 11, 368 P.3d 846 (stating that we examine "the statute as a whole, and interpret its provisions in harmony with other statutes in the same chapter and related chapters," and that we try to "avoid any interpretation which renders parts or

words in a statute inoperative or superfluous" (quotation simplified)). And when we view and interpret the first four subsections of the governing statute together, we discern but one interpretation—one that largely aligns with Mother's—under which all of the statute's provisions have significant meaning.

¶19  Under that interpretation, a relinquishing parent is required to sign a document effectuating that relinquishment, but the parent is not necessarily required to sign that document in front of the court.[4] We recognize that, in many (if not most) cases, the parent actually does sign a document in the court's presence at a relinquishment hearing.[5] But the statute does not require this.

---

4. Subsections (1) and (3) of the governing statute appear to leave open the possibility that, in some subset of cases, a person other than a juvenile court judge may be authorized to take relinquishments. *See* Utah Code Ann. § 80-4-307(1), (3) (LexisNexis Supp. 2022). But because subsection (2) makes clear that, in all cases that concern children in state custody or under the jurisdiction of the juvenile court, only the juvenile court judge may take relinquishments, and because this case involves such a child, in this opinion for convenience's sake we sometimes use "court" or "judge" to more generally connote persons authorized under the statute to take relinquishments. To be clear, our analysis of the statute—and, specifically, our conclusion that a signed relinquishment document is required, even if that document need not be signed in the presence of the person authorized to take relinquishments so long as the parent "confirm[s]" his or her relinquishment under oath to that person—remains unchanged, even as applicable to those presumably less common situations in which a person other than the court takes the relinquishment.

5. We offer our view that having the relinquishing parent sign the relinquishment document either prior to the relinquishment hearing or in the court's presence at the hearing—regardless of

(continued…)

While a relinquishing parent must sign a relinquishment document, the statute allows for situations in which the parent affixes his or her signature to that document at some point before or after the hearing, outside the presence of the court, but nevertheless appears before the court to "confirm" under oath that he or she understands the relinquishment document and signed (or will sign) it freely and voluntarily. The "sign or confirm" language from subsection (1), then, refers to the act that must occur "under oath before" the court, and indicates that at least one (but not necessarily both) of those two things—signature or confirmation—must take place in the judge's presence. This language can readily and sensibly coexist alongside a statutory requirement that—at some point, whether in the judge's presence or not—the parent actually sign a relinquishment document.

¶20    While we can discern potential meaning for the "or confirm" language in subsection (1) under Mother's interpretation, we are unable to discern any sensible meaning for subsections (3) and (4) under the interpretation offered by the State and the GAL. We can make no sense of subsection (3) under an interpretation of the statute that does not require a signed relinquishment document. As noted, that subsection requires the person taking the relinquishment—often a juvenile court judge, in cases governed by this statute—to "certify" that the "individual *executing* the consent or relinquishment has read and understands" the document and "has *signed* [it] freely and

---

whether that hearing is conducted in-person or virtually—constitutes best practice, because it fosters clarity and finality by eliminating the possibility that the parent may change his or her mind after the hearing and refuse to sign the document (as happened here). We encourage attorneys and judges—in both district and juvenile court, as applicable—to adopt this practice. And we discourage the practice of having relinquishing parents sign the document *after* the relinquishment hearing, even though that practice is permitted by the text of the governing statute.

voluntarily." *See* Utah Code Ann. § 80-4-307(3) (emphasis added). This subsection clearly envisions that the relinquishing parent will sign a relinquishment document, and cannot reasonably be interpreted otherwise.

¶21 The arguments lodged in response by the State and the GAL effectively acknowledge that their proposed interpretation of the statute requires this subsection to be ignored. They assert that subsection (3) is a "vestigial" remnant of a previous version of the statute in which relinquishments in child welfare cases were taken more often by persons other than juvenile court judges, and they urge us to view this language as applicable only to the subset of cases in which relinquishments are taken by non-judges. And they assert that its textual requirements—that a judge must certify that a parent's *signature* was freely and voluntarily made— "should be of no consequence" so long as the court "adhere[s] to the higher standard" of placing the parent under oath, taking live testimony, and making findings based on clear and convincing evidence regarding the parent's orally expressed desire to relinquish. But these arguments run directly counter to the statutory text. Subsection (3) still includes "[t]he court" as one of the persons who must make a certification, and specifically requires the court to "certify" that the parent has "signed" the relinquishment document freely and voluntarily. *See id.* We simply cannot view this subsection as vestigial, in the way asserted by the State and the GAL, when the plain language of the subsection indicates that it is not. In the end, the State and the GAL—by urging us to adopt an interpretation of the statute that does not require a signed relinquishment document—are asking us to effectively read subsection (3) out of the statute, something we are simply not permitted to do.

¶22 Similarly, subsection (4)—like subsection (3)—also clearly requires a signed relinquishment document. *See id.* § 80-4-307(4) (stating that a parent's relinquishment is "effective when the voluntary relinquishment or consent is signed"). The State and the

GAL assert that this subsection refers to the *court's* signature, but this is a strained reading of the statute. We acknowledge that subsection (4) is phrased in the passive voice, and does not directly specify whose signature on the relinquishment document makes the relinquishment "effective." *See id.* But subsections (1) and (3) are clearly referring to the *parent's* signature on the relinquishment document. *See id.* § 80-4-307(1), (3). And we read statutes holistically, viewing all the subsections together. *See Penunuri*, 2013 UT 22, ¶ 15. In doing so here, we conclude that subsection (4)'s passively stated reference to a signature must refer to the same signatures discussed in the preceding subsections—namely, parents' signatures on relinquishment documents—and does not refer to the court's signature on either its subsection (3) certification or the ultimate termination order.[6]

¶23　Thus, only one of the two proposed interpretations of the governing statute—the one that reads the statute as containing a requirement for a signed relinquishment document—allows us to construe it "so that no part or provision will be inoperative or

---

6. We agree with the State and the GAL, however, that a parent's signature on a relinquishment document is not the same thing as the court's signature on an order terminating the parent's rights. To be sure, only a judge's signature on a court order can effectuate the ultimate termination of a parent's rights. Indeed, even after a parent has signed a relinquishment document, a court may decide to reject the parent's relinquishment if (for instance) the court finds that the parent is attempting to shirk his or her child support obligation, or that the parent has not freely and voluntarily signed the document. *See* Utah Code Ann. § 80-4-307(3), (6). But we read subsection (4) as referring to the parent's signature on the relinquishment document, and as mandating that, once a parent has signed a relinquishment document, the parent's relinquishment is "effective" and irrevocable as against the parent, and that the parent may not thereafter make a unilateral decision to rescind his or her signature. *See id.* § 80-4-307(4).

superfluous, void or insignificant, and so that one section will not destroy another." *See State v. Jeffries*, 2009 UT 57, ¶ 9, 217 P.3d 265 (quotation simplified). The interpretation offered by the State and the GAL requires us to effectively ignore most of two of the statute's subsections, and does not lead to a unified cohesive construction. Because we endeavor to give voice to statutory interpretations that offer a "harmonious whole," *see Penunuri*, 2013 UT 22, ¶ 15 (quotation simplified), and because only one of the two interpretations here does so, we interpret the statute more or less as Mother does: a parent must sign a relinquishment document in order for his or her relinquishment to be effective, and if no such document is ever signed, the relinquishment is incomplete and ineffective.

¶24    We view this result as compelled by the plain language of the statute. And we are of course aware that we, as judges, are not policymakers, and that when interpreting statutes "[i]t is not our task to weigh competing policy considerations." *See Vineyard Props. of Utah LLC v. RLS Constr. LLC*, 2021 UT App 144, ¶ 40, 505 P.3d 65. Our legislature, when drafting statutes like the one at issue here, weighs competing policy interests and makes textual choices that further its chosen policy goals. In particular, enacting a statute such as the one at issue here requires careful balancing of the policy interests of the State, children, biological parents, foster parents, and adoptive parents, among others, and our legislature's textual choices in enacting this statute could have reflected a number of various policy aims. It is beyond dispute, however, that legitimate policy considerations undergird any legislative choice to adopt a requirement that relinquishing parents sign a document in order for their relinquishment to become effective. Giving up the fundamental right to raise one's child is a momentous step in a parent's life, and one that the legislature could reasonably have wanted memorialized with the certitude of a signature. And requiring a signed document also serves important goals in the child welfare arena, including clarity and finality; if a signature is required, it is presumably much less

likely for relinquishing parents to be able to successfully challenge their relinquishment after the fact. Thus, while it is not our task to weigh policy considerations, there are certainly valid policy goals that are furthered by our interpretation of the governing statute. And to the extent we have misperceived legislative intent in our evaluation of the text of the statute, our legislature is free to amend it to further these or other policy goals.

CONCLUSION

¶25     The statute at issue here requires a person relinquishing parental rights to—at some point—sign a document effectuating the relinquishment. Even though Mother appeared in court and, under oath, indicated her willingness to relinquish her parental rights, she never signed a document to that effect. Accordingly, her relinquishment did not become effective, and the juvenile court erred by declining to set aside that nascent relinquishment and by proceeding to terminate her parental rights. We therefore reverse the juvenile court's termination order and remand the case for further proceedings, which may include a rescheduled termination trial.

———————