**2014 UT App 190**

## THE UTAH COURT OF APPEALS

PHILIP RUTHERFORD AND WENDY RUTHERFORD, ON BEHALF OF
THEIR MINOR CHILD, LEVI RUTHERFORD,
Plaintiffs and Appellees,
*v.*
TALISKER CANYONS FINANCE CO., LLC AND ASC UTAH, LLC,
Defendants and Appellants.

Opinion
No. 20120990-CA
Filed August 14, 2014

Third District Court, Silver Summit Department
The Honorable Todd M. Shaughnessy
No. 100500564

Eric P. Lee, M. Alex Natt, Elizabeth Butler, and
Timothy C. Houpt, Attorneys for Appellants

David A. Cutt, Attorney for Appellees

JUDGE JAMES Z. DAVIS authored this Opinion, in which JUDGE
GREGORY K. ORME and SENIOR JUDGE PAMELA T. GREENWOOD
concurred.[1]

DAVIS, Judge:

¶1    Talisker Canyons Finance Co., LLC and ASC Utah, LLC
(collectively, the Ski Resort) bring this interlocutory appeal
challenging the trial court's denial of their motion for summary
judgment and the trial court's grant of partial summary judgment
in favor of Philip and Wendy Rutherford, on behalf of their minor

---

1. The Honorable Pamela T. Greenwood, Senior Judge, sat by
special assignment as authorized by law. *See generally* Utah Code
Jud. Admin. R. 11-201(6).

child, Levi Rutherford (collectively, the Rutherfords). We affirm in part, vacate in part, and remand for further proceedings in accordance with this decision.

BACKGROUND

¶2     In 2010, ten-year-old Levi Rutherford was a member of the Summit Ski Team, a ski racing club that is affiliated with the United States Ski and Snowboard Association (the USSA). The Ski Team trained primarily at the Canyons, a ski resort near Park City, Utah, with the resort's permission and subject to the resort's requirement that the Ski Team carry liability insurance. The Ski Team's liability insurance was provided through its affiliation with USSA. All Summit Ski Team participants were required to become USSA members, and USSA membership required applicants to execute a release indemnifying USSA from any injury the individual may suffer in connection with his participation in USSA-associated activities, regardless of USSA's negligence. Because of Levi's age, his father, Philip Rutherford, executed the release on Levi's behalf. In that agreement, the term "USSA" is defined as including, inter alia, local ski clubs and ski and snowboard facility operators.

¶3     On January 15, 2010, Levi and his seven-year-old brother were at the Canyons to attend a Ski Team race-training session. The brothers rode a chairlift that carried them along the length of the "Retreat" ski run where the Ski Team was setting up for practice. Snowmaking machines along the Retreat run were actively making snow at this time. After exiting the chairlift, Levi and his brother skied down Retreat.[2] Levi skied down the slope maintaining a racing stance and without making any turns. Near the bottom of the run, Levi fell when he collided with a mound of man-made snow that was of a different and wetter consistency than other snow on the run. Levi sustained injuries as a result of his fall.

---

2. It is unclear whether the Ski Team coaches instructed Levi and his brother to take a warm-up run down Retreat or whether the brothers did so of their own accord. *See infra* note 7.

¶4      The Rutherfords filed a complaint against the Ski Resort and the Ski Team, seeking damages for Levi's injuries, which they claim were caused by the defendants' negligence. As against the Ski Resort specifically, the Rutherfords alleged that the machine that produced the snow mound was not functioning properly, that the Ski Resort could have warned patrons of the hazard by marking the mound or closing the trail, and that the Ski Resort did not adequately monitor the snowmaking taking place on the Retreat run that day.

¶5      The parties filed several motions for summary judgment. The Ski Team submitted motions for summary judgment on the basis that Utah's Inherent Risks of Skiing Act (the Act) precluded the Rutherfords' claims against it because Levi was indisputably injured when he crashed into a mound of machine-made snow, an inherent risk of skiing for which ski-area operators are exempted from liability under the Act. *See generally* Utah Code Ann. §§ 78B-4-401 to -404 (LexisNexis 2012) (Inherent Risks of Skiing Act); *id.* § 78B-4-402(1)(b) (machine-made snow exemption). The Ski Team also contended that it had no duty to protect Levi from a risk inherent to skiing and that it otherwise did not owe him a general duty of care as alleged by the Rutherfords. The Ski Resort joined in the Ski Team's motions, specifically arguing that the Act exempts the Ski Resort, as a ski-area operator, from any duty to protect Levi from the inherent risk of skiing posed by the mound of machine-made snow. The Ski Resort did not argue that any of the Act's exemptions other than the machine-made snow exemption applied in this case. The Rutherfords moved for partial summary judgment, arguing that the Act did not bar their claims against the Ski Resort.

¶6      The trial court rejected the Ski Team's argument that it is entitled to protection under the Act but granted the Ski Team's motion for summary judgment on the negligence issue, dismissing with prejudice the Rutherfords' negligence claim against it. The trial court concluded that "the Ski Team did not owe Levi a general duty of reasonable care to protect him from harm as alleged by [the Rutherfords]" and that even assuming that it did, "given the undisputed facts in this case, no reasonable jury could find that the

Ski Team breached such a duty."[3] The trial court denied the Ski Resorts' joinder in the Ski Team's motion for summary judgment based on the Act, ruling that the applicability of the Act and the machine-made snow exemption to the Ski Resort depended on the resolution of disputed facts, namely, whether the snowmaking equipment along Retreat was functioning properly. The trial court granted the Rutherfords' motion for partial summary judgment based on their argument that the Act did not bar their claims against the Ski Resort.

¶7     The Ski Resort also filed a motion for summary judgment on the basis that the USSA release that Mr. Rutherford signed on behalf of his son barred Levi's claims. The court denied the motion based on its determinations (1) that the waiver's Colorado choice-of-law provision "is unenforceable and . . . Utah law applies to the USSA release"; (2) that the release is unenforceable under Utah law based on the Utah Supreme Court's decision in *Hawkins ex rel. Hawkins v. Peart*, 2001 UT 94, 37 P.3d 1062; and (3) that even if the release was enforceable under Utah or Colorado law, Levi was not racing at the time of his injury or otherwise engaged in the activities covered by the release because the Ski Team's practice had not yet begun. The Ski Resort petitioned for interlocutory review, which was granted by our supreme court and assigned to this court.

ISSUES AND STANDARD OF REVIEW

¶8     The Ski Resort contends that the trial court erroneously granted the Rutherfords' motion for partial summary judgment after finding that Levi was not engaged in race training at the time of his injury and that an exemption in the Act regarding competitive skiing did not bar the Rutherfords' claims. *See* Utah Code Ann. § 78B-4-402(1)(g) (competitive-skiing exemption). The Ski Resort also asserts that the trial court's interpretation of the Act's machine-made snow exemption was incorrect and that, as a

---

3. The Ski Team is not a party to this interlocutory appeal.

matter of law, summary judgment should be entered for the Ski Resort based on either the machine-made snow exemption or the competitive-skiing exemption. Last, the Ski Resort argues that the trial court erred in determining that the Colorado choice-of-law provision in the USSA release was not enforceable, that the release was not enforceable under Utah law, and that the release was nevertheless inapplicable here, where Levi was engaged in an activity not covered by the release when he was injured.

¶9      Summary judgment is appropriate "only when all the facts entitling the moving party to a judgment are clearly established or admitted" and the "undisputed facts provided by the moving party . . . preclude[], as a matter of law, the awarding of any relief to the losing party." *Smith v. Four Corners Mental Health Ctr., Inc.*, 2003 UT 23, ¶ 24, 70 P.3d 904 (alteration in original) (citations and internal quotation marks omitted); *see also* Utah R. Civ. P. 56(c). "We also note that summary judgment is generally inappropriate to resolve negligence claims and should be employed only in the most clear-cut case." *White v. Deseelhorst*, 879 P.2d 1371, 1374 (Utah 1994) (citation and internal quotation marks omitted). "An appellate court reviews a trial court's legal conclusions and ultimate grant or denial of summary judgment for correctness, and views the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Orvis v. Johnson*, 2008 UT 2, ¶ 6, 177 P.3d 600 (citations and internal quotation marks omitted).

ANALYSIS

I. The Distinction Between Competitive Skiing and Recreational Skiing

¶10     The Act exempts ski resorts from liability for injuries sustained by individuals engaged in "competitive" skiing, including injuries sustained as a result of an individual's "participation in, or practicing or training for, competitions or special events." *See* Utah Code Ann. § 78B-4-402(1)(g) (LexisNexis

2012).[4] Here, a determination that Levi was injured while engaged in competitive, as opposed to recreational, skiing under the Act could be case-determinative.[5]

¶11    In their complaint, the Rutherfords allege that Levi was injured during Ski Team practice, stating, "[T]he Summit Ski Team instructed Levi to ski down the Retreat run. . . . As Levi was skiing down Retreat, he crashed into [a mound of snow] and sustained serious injuries . . . ." Similarly, in the Rutherfords' motions for partial summary judgment as to the enforceability of the Act and the USSA release, they state, "Levi was injured while participating in racing practice as a member of [the Ski Team]."[6] Further, the

---

4. Except where otherwise noted, we cite the most recent version of the Utah Code for the convenience of the reader.

5. The applicability of the USSA release could also turn on whether Levi was injured while engaged in one of the activities specifically enumerated in the release; if he was not, then the release cannot apply, rendering irrelevant the question of the release's enforceability under Utah or Colorado law. The release defines the covered activities as "skiing and snowboarding in their various forms, as well as preparation for, participation in, coaching, volunteering, officiating and related activities in alpine, nordic, freestyle, disabled, and snowboarding competitions and clinics" "in which USSA is involved in any way." Because USSA employs different terminology to describe the competitive skiing activities covered by the release, a determination that Levi was not injured while competitively skiing under the terms of the Act would not necessarily foreclose a finding that he was engaged in an activity covered by the release. However, because we determine that the release is unenforceable for other reasons, *see infra* ¶ 30, we need not address whether Levi was injured while engaging in an activity covered by the release.

6. On appeal, the Rutherfords assert that they "never alleged that Levi was injured while ski racing" but only that he "was injured in

(continued...)

Rutherfords' expert witness, whose statement was submitted with the Rutherfords' summary judgment filings, based his expert report and evaluation on the premise that Levi was engaged in race training and practice. In its response to the Rutherfords' motions, the Ski Resort agreed that it was an undisputed fact that "Levi was injured while participating in racing practice as a member of the [Ski Team]."[7]

¶12   The trial court, however, likened Levi to a recreational skier, rather than a competitive skier, and determined that Levi's accident occurred while he was "skiing on an open run that any member of the public could ski on" and that his accident indisputably did not

---

6. (...continued)
connection with Ski Team practice," and that it was through discovery that they learned that Levi was injured before practice started. To the extent this sentiment is contradictory to the allegations contained in the Rutherfords' complaint, we note that "[a]n admission of fact in a pleading is a judicial admission and is normally conclusive on the party making it." *See Baldwin v. Vantage Corp.*, 676 P.2d 413, 415 (Utah 1984); *see also Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1197 n.6 (2013) (holding that a party was bound by an admission in its answer); *Belnap v. Fox*, 251 P. 1073, 1074 (Utah 1926) (overturning a finding entered by the trial court because the finding was "against and in conflict with the admission in the answer of the principal defendant"). *But see Baldwin*, 676 P.2d at 415 (recognizing "that an admission may be waived where the parties treat the admitted fact as an issue").

7. The Ski Team, although not a party to this appeal, disputed in part the Rutherfords' assertion that Levi was injured during practice, stating, "[A]lthough Levi was injured during a practice in which the [Ski Team] had intended to conduct race training, he was injured while free skiing and not while running gates." The Ski Team's summary judgment filings imply that there is a factual dispute as to whether a "warm-up" run can constitute part of the Ski Team's race training. *See supra* note 2.

occur during a ski race, while skiing through gates, or while otherwise "negotiating for training purposes something that had been specifically designated as a race course." The trial court made this ruling in the context of rejecting the Ski Resort's argument that the USSA release is enforceable under Utah law. Thus, while the specific details in the trial court's ruling are not entirely in conflict with the parties' undisputed statement of fact that Levi was injured during race training, the court's comparison of Levi to a recreational skier amounts to a rejection of the parties' undisputed statement of fact. This ruling also implies a distinction between injuries sustained during a competition and injuries sustained during training for competition that is not made in the Act's provision that "participation in, or practicing or training for, competitions" are all inherent risks of skiing. *See* Utah Code Ann. §78B-4-402(1)(g). We conclude that the trial court improperly made a finding in the summary judgment context and that its finding is contrary to what appear to be undisputed facts. We vacate this ruling and direct the trial court to reconsider the parties' arguments in light of the undisputed statements of fact as set forth in the Rutherfords' and the Ski Resort's pleadings and motion filings.[8] *See*

---

8. Although we often provide guidance for the trial court on remand by addressing "[i]ssues that are fully briefed on appeal and are likely to be presented on remand," *State v. James*, 819 P.2d 781, 795 (Utah 1991), we do not address whether the competitive-skiing exemption precludes the Rutherfords' claims against the Ski Resort based on the parties' agreement that Levi was injured while engaged in race training. That argument was not presented below, nor was it sufficiently briefed on appeal. *See McCleve Props., LLC v. D. Ray Hult Family Ltd. P'ship*, 2013 UT App 185, ¶ 19, 307 P.3d 650 (determining that "it is better to leave" a legal issue that was not addressed by the parties in briefing "for the district court to address in the first instance based on appropriate briefing by the parties" than to "endeavor to provide the district court with guidance"); *cf. Medley v. Medley*, 2004 UT App 179, ¶ 11 n.6, 93 P.3d 847 (declining to provide the trial court with guidance on a legal issue likely to arise on remand where the court of appeals had "no

(continued...)

*Staker v. Ainsworth*, 785 P.2d 417, 419 (Utah 1990) ("Where a triable issue of material fact exists, the cause will be remanded for determination of that issue."). We likewise leave for the trial court's determination the question of whether Levi's engagement in race training at the time of his injury is truly undisputed by the parties.

## II. The Machine-Made Snow Exemption

¶13    The Ski Resort next argues that the trial court erroneously denied its motion for summary judgment based on the machine-made snow exemption under the Act, particularly where the machine that produced the snow mound that Levi skied into "was indisputably making snow." (Emphasis omitted.) The Act identifies as an inherent risk of skiing "snow or ice conditions as they exist or may change, such as hard pack, powder, packed powder, wind pack, corn, crust, slush, cut-up snow, or machine-made snow." Utah Code Ann. § 78B-4-402(1)(b); *see also id.* § 78B-4-402(1)(d) (immunizing ski-area operators from injuries caused by "variations or steepness in terrain, whether natural or as a result of slope design, snowmaking or grooming operations").

¶14    The Ski Resort contends that the Rutherfords' "allegations fall squarely into" the machine-made snow exemption given the Rutherfords' own assertion that Levi was injured when he came into contact with a patch of wet, machine-made snow. As a result, the Ski Resort argues, the trial court "erred in ruling that a mere allegation of malfunctioning snowmaking equipment was sufficient to force a jury trial."[9]

---

8. (...continued)
consensus on whether [it] should offer guidance . . . and, if so, what any such guidance should be").

9. Because we ultimately reject the Ski Resort's interpretation of the Act, we do not address the Rutherfords' argument that the Ski Resort's interpretation renders the Act unconstitutional.

¶15    The trial court ruled,

> Solely for purposes of this Motion, the existence of
> ongoing snowmaking is an inherent risk of skiing
> and a type of danger that skiers wish to confront.
> Among other things, plaintiff claims that the
> snowmaking equipment in this particular case was
> not functioning properly. That claim creates a
> question of fact as to whether skiers wish to confront
> this type of risk and whether that risk could be
> eliminated through the exercise of reasonable care.

The trial court's ruling recognizes the principles explained in *Clover v. Snowbird Ski Resort*, 808 P.2d 1037 (Utah 1991). In that case, our supreme court expressly rejected Snowbird Ski Resort's argument that recovery from the resort for "any injury occasioned by one or more of the dangers listed in [the Act] is barred by the statute because, as a matter of law, such an accident is caused by an inherent risk of skiing." *Id.* at 1044–45. Instead, the court held that the Act "does not purport to grant ski area operators complete immunity from all negligence claims initiated by skiers" but protects ski-area operators "from suits to recover for injuries caused by one or more of the dangers listed [in the Act] *only* to the extent those dangers, under the facts of each case, are integral aspects of the sport of skiing." *Id.* at 1044 (emphasis added). The court interpreted the Act as providing a non-exclusive list of dangers that must be analyzed on a case-by-case basis to determine whether a given danger is "inherent" in the sport. *Id.* at 1044–45 (alteration in original) (quoting Utah Code Ann. § 78-27-52(1) (current version at *id.* § 78B-4-402(1) (LexisNexis 2012))).

¶16    The court explained, "The term 'inherent risk of skiing,' using the ordinary and accepted meaning of the term 'inherent,' refers to those risks that are essential characteristics of skiing—risks that are so integrally related to skiing that the sport cannot be undertaken without confronting these risks." *Id.* at 1047. The court divided these risks into two categories, the first of which represents "those risks, such as steep grades, powder, and mogul runs, which skiers wish to confront as an essential characteristic of skiing." *Id.*

Under the Act, "a ski area operator is under no duty to make all of its runs as safe as possible by eliminating the type of dangers that skiers wish to confront as an integral part of skiing." *Id.*

¶17    "The second category of risks consists of those hazards which no one wishes to confront but cannot be alleviated by the use of reasonable care on the part of a ski resort," such as weather and snow conditions that may "suddenly change and, without warning, create new hazards where no hazard previously existed." *Id.* For this category of risks, "[t]he only duty ski area operators have . . . is the requirement set out in [the Act] that they warn their patrons, in the manner prescribed in the statute, of the general dangers patrons must confront when participating in the sport of skiing." *Id.* However, this does not exonerate a ski-area operator from any "duty to use ordinary care to protect its patrons"; "if an injury was caused by an unnecessary hazard that could have been eliminated by the use of ordinary care, such a hazard is not, in the ordinary sense of the term, an inherent risk of skiing and would fall outside of [the Act]." *Id.* The *Clover* court then applied its interpretation of the Act to the facts before it, stating that because "the existence of a blind jump with a landing area located at a point where skiers enter the run is not an essential characteristic of an intermediate run," the plaintiff could "recover if she [could] prove that [the ski resort] could have prevented the accident through the use of ordinary care." *Id.* at 1048; *see also White v. Deseelhorst*, 879 P.2d 1371, 1374–75 (Utah 1994) (reaffirming the approach taken by the court in *Clover* and concluding that summary judgment was precluded by the question of fact as to whether "an unmarked cat track on the blind side of a ridge" was a risk that the ski resort "could have alleviated . . . through the exercise of ordinary care").

¶18    In light of how narrowly the *Clover* court's ruling suggests the inherent risk determination ought to be framed, we agree with the trial court here that summary judgment in favor of the Ski Resort is not appropriate on this claim. The trial court recognized that under the facts of this case, "the existence of ongoing snowmaking is an inherent risk of skiing and a type of danger that skiers wish to confront" but that the Rutherfords' allegations that the equipment "was not functioning properly," "[a]mong other

things," created questions of fact as to "whether skiers wish to confront [the] type of risk" created by malfunctioning snowmaking equipment and "whether that risk could be eliminated through the exercise of reasonable care." *Cf. Moradian v. Deer Valley Resort Co.*, No. 2:10-CV-00615-DN, 2012 WL 3544820, at *4 (D. Utah Aug. 16, 2012) (affirming summary judgment in favor of a ski resort based on a provision in Utah's Inherent Risks of Skiing Act that immunizes ski-area operators from injuries sustained by a patron's collision with other patrons because "[t]his type of collision cannot be completely prevented even with the exercise of reasonable care, and is an inherent risk in the sport of skiing," and rejecting the plaintiff's speculation that the individual that collided with him was a Deer Valley employee as insufficient "to create a genuine issue of material fact necessary to defeat summary judgment"). Accordingly, we affirm the trial court's ruling that questions of fact regarding the applicability of the machine-made snow exemption preclude summary judgment on this issue, and we likewise reject the Ski Resort's argument that the inclusion of machine-made snow as an inherent risk of skiing in the Act is, by itself, sufficient to immunize the resort from liability in this case.[10] *See White*, 879 P.2d

---

10. It is notable, as the Ski Resort points out in its opening brief, that the language of the Act has broadened since the issuance of *Clover*. *See Clover v. Snowbird Ski Resort*, 808 P.2d 1037, 1044 (Utah 1991). At the time *Clover* was decided, the Act listed "snow or ice conditions" as inherent risks. *Id.* In the current version of the Act, those same risks are described as "snow or ice conditions, as they exist or may change, such as hard pack, powder, packed powder, wind pack, corn, crust, slush, cut-up snow, or machine-made snow." *See* Act of March 1, 2006, ch. 126, § 1, 2006 Utah Laws 549, 549 (codified at Utah Code Ann. § 78B-4-402(1)(b) (LexisNexis 2012)). The Ski Resort contends that this expansion supports the "practical" necessity of interpreting "the Act broadly when allegations regarding the consistency of snow are in issue" because "the consistency of the snow cannot be objectively tested, measured, retained, analyzed, photographed, or reliably documented." That this element may be hard to prove, however,

(continued...)

at 1374 ("Courts cannot determine that a risk is inherent in skiing simply by asking whether it happens to be one of those listed in [the Act].").

### III. Enforceability of the USSA Release

¶19    To the extent our analysis of the issues raised under the Act may not be dispositive of this case on remand, we next address the parties' arguments related to the USSA release. *See State v. James*, 819 P.2d 781, 795 (Utah 1991) ("Issues that are fully briefed on appeal and are likely to be presented on remand should be addressed by [the appellate] court."). The Ski Resort challenges the trial court's determination that the Colorado choice-of-law provision in the USSA release was not enforceable in this case and the court's subsequent application of Utah law. The Ski Resort contends that the USSA release is enforceable under both Utah and Colorado law and that as a result, the release immunizes it from the Rutherfords' claims.[11] We address each argument in turn.

### A.    The Colorado Choice-of-Law Provision

¶20    The Ski Resort contends that the trial court erred in ruling that the Colorado choice-of-law provision in the USSA release was

---

10. (...continued)
is not a persuasive reason to otherwise repudiate our supreme court's precedent rebuffing the notion that the presence of a risk on the list in the Act is necessarily the end of the inquiry. *See White v. Deseelhorst*, 879 P.2d 1371, 1374 (Utah 1994); *Clover*, 808 P.2d at 1044. We likewise reject the Ski Resort's argument that the post-*Clover* amendment to the statute adding the competitive-skiing exemption conflicts with the *Clover* analysis in a manner that "would render the statutory language nonsensical."

11. Because of the manner in which we resolve the issues under this heading, we decline to address what impact, if any, the fact that the Ski Resort is not a signatory to the USSA release may have on the applicability of the release to the Ski Resort.

not enforceable based on the court's determination that "Utah is the only state that has an interest in the outcome of the case." The Ski Resort explains that USSA's operation as a national organization justifies the need for the choice-of-law provision. It also explains that the USSA designated Colorado law because the USSA holds "more major events in Colorado than any other state" and "more USSA athletes compete in Colorado than any other state," thereby giving Colorado "a particular interest in the outcome of this case." We review the trial court's choice-of-law analysis for correctness. *See One Beacon Am. Ins. Co. v. Huntsman Polymers Corp.*, 2012 UT App 100, ¶ 24, 276 P.3d 1156.

¶21 "Since Utah is the forum state, Utah's choice of law rules determine the outcome of" whether Utah law or Colorado law applies. *See Waddoups v. Amalgamated Sugar Co.*, 2002 UT 69, ¶ 14, 54 P.3d 1054. To determine whether the choice of Colorado law will govern our substantive interpretation of the USSA release, we must determine first whether "'two or more states have an interest in the determination of the particular issue'" in this case and, if so, we then analyze whether Colorado has a "'substantial relationship to the parties or the transaction'" or there is a "'reasonable basis for the parties['] choice.'" *Prows v. Pinpoint Retail Sys., Inc.*, 868 P.2d 809, 811 (Utah 1993) (quoting Restatement (Second) of Conflict of Laws § 187(2)(a) & cmt. d (Supp. 1988)).

¶22 In *Prows v. Pinpoint Retail Systems, Inc.*, 868 P.2d 809 (Utah 1993), a Canadian company that conducted business throughout the United States sought to enforce a New York choice-of-law provision contained in a contract it entered into with a Utah-based business. *Id.* at 810–11. The Utah Supreme Court recognized that although "New York has no substantial relationship to the parties or the transaction, there is a reasonable basis for [the Canadian company's] choosing New York law to govern the [contract]"—"to limit the number of forums in which it may be required to bring or defend an action." *Id.* at 811 (internal quotation marks omitted). Nonetheless, the court concluded that "[t]he existence of that 'reasonable basis,' . . . [was] without effect" because "New York [had] no interest in the determination of [the] case." *Id.* The court identified various "relevant contacts" that Utah had with the case

and concluded that Utah was "the only state with an interest in the action." *Id.* (internal quotation marks omitted). Specifically, the court noted that a "Utah plaintiff brought this suit against a Utah defendant and a Canadian defendant," that the contract "was to be performed in Utah," that the contract "was signed in Utah, and [that] the alleged breach and tortious conduct occurred [in Utah]." *Id.* In other words, without any similar relevant contacts, New York had no interest in the case for the choice-of-law provision to be enforceable. *Id.*

¶23    Besides analyzing what contacts a state may have with the case, *Prows* does not provide much guidance for our analysis of whether Colorado has an interest in this case. Indeed, *Prows* appears to use the terms "interest in," "substantial relationship," and "relevant contacts" interchangeably. Accordingly, we look to the Restatement for guidance. *See American Nat'l Fire Ins. Co. v. Farmers Ins. Exch.*, 927 P.2d 186, 190 (Utah 1996) (noting that Utah courts should apply the test "explained in Restatement of Conflict section 188" to resolve "a conflict of laws question in a contract dispute"). The Restatement lists several factors a court might consider in analyzing the significance of a state's relationship to the parties and transaction at issue, including, "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties." Restatement (Second) of Conflict of Laws § 188(2) (1971).

¶24    Here, any interest the state of Colorado may have in this case arises out of the possibility that Levi could have competed in Colorado at some point during the relevant ski season as a USSA member because USSA holds most of its competitions in Colorado and that is where most USSA athletes compete. According to the Ski Resort, "at the time they entered the contract, the parties did not know and could not have known the full geographic scope of where the [USSA] contract was to be performed." All of these factors, however, relate to the reasonableness of USSA's choice of Colorado law, not Colorado's interest in or substantial relationship with the parties in this case or the transaction at issue. As dictated

by *Prows*, USSA's interest in having one state's laws apply to its contracts with its members located throughout the country, and the logic behind its choice of Colorado law specifically, does not vest in the state of Colorado a "substantial relationship" or "interest in" the parties or the transaction before us. *See Prows,* 868 P.2d at 811. And, as in *Prows,* the state of Utah clearly has an interest in the determination of this case; the Rutherfords entered into the USSA release while domiciled in Utah, they remained domiciled in Utah at the time of Levi's injury, Levi's injury occurred in Utah, USSA is a Utah entity, and the Ski Resort's principal place of business is in Utah. *See id.* Accordingly, the choice-of-law provision does not control in this case and we rely on Utah law to determine the enforceability of the release.

B.      Enforceability of the USSA Release under Utah Law

¶25     The Ski Resort argues that even if the Colorado law provision does not apply here, the USSA release is enforceable under Utah law. The trial court determined that the release was unenforceable under Utah law based on case law describing a general policy in Utah rejecting pre-injury releases signed by parents on behalf of minors and, alternatively, based on its determination that Levi was a recreational skier and pre-injury releases executed by recreational skiers are not valid under the Act. We agree with the trial court that the release, as it may apply to the Ski Resort, is unenforceable under Utah law, but we reach this conclusion based on somewhat different reasoning. *See Bailey v. Bayles*, 2002 UT 58, ¶ 13, 52 P.3d 1158 ("[A]n appellate court may affirm the judgment appealed from if it is sustainable on any legal ground or theory apparent on the record." (emphasis, citation, and internal quotation marks omitted)).

1.      Enforceability of the USSA Release Based on Levi's Status as a Minor

¶26     The trial court ruled that Utah law rejects pre-injury releases signed by a parent on behalf of a minor, rendering the USSA release invalid in Utah. The trial court interpreted Utah case law as "prevent[ing] enforcement of the USSA release," relying

specifically on one Utah Supreme Court case in which the court rejected as against public policy a pre-injury release signed by a parent on behalf of a minor as a prerequisite to the minor's participation in a recreational horseback ride. *See Hawkins ex rel. Hawkins v. Peart*, 2001 UT 94, ¶¶ 2, 13–14, 37 P.3d 1062, *superseded by statute*, Utah Code Ann. § 78B-4-203(2)(b) (LexisNexis 2012), *as recognized in Penunuri v. Sundance Partners, Ltd.*, 2013 UT 22, ¶ 21 n.43, 301 P.3d 984.

¶27    In *Hawkins*, a minor was injured when she was thrown off of a horse during a guided trail ride. *Id.* ¶ 3. She filed suit against the company that provided the horses and trail guides based on various claims of negligence. *Id.* The guide company argued that a release signed by the minor's mother prior to the horseback ride precluded her suit. *Id.* In addressing the parties' arguments, the supreme court recognized that releases for liability are, in general, permitted in most jurisdictions "for prospective negligence, except where there is a strong public interest in the services provided." *Id.* ¶ 9. The court recognized various standards and criteria employed in other jurisdictions to aid in "determining public policy limitations on releases" but declined to specifically adopt any one standard. *Id.* ¶¶ 9–10. Instead, the *Hawkins* court held that "[i]n the absence of controlling statutes or case law," "general statements of policy found in statutes detailing the rights of minors and the responsibilities of guardians" demonstrate a public policy in Utah disfavoring "contracts releasing individuals or entities from liability for future injuries to minors." *Id.* ¶¶ 7, 11–13. The court was also persuaded by the "clear majority of courts treating the issue" that "have held that a parent may not release a minor's prospective claim for negligence." *Id.* ¶ 10 (collecting cases). Most notably, the court adopted the holding expressed by the Washington Supreme Court that "'[s]ince a parent generally may not release a child's cause of action after injury, it makes little, if any, sense to conclude a parent has authority to release a child's cause of action prior to an injury.'" *Id.* ¶¶ 10, 13 (alteration in original) (quoting *Scott ex rel. Scott v. Pacific W. Mountain Resort*, 834 P.2d 6, 11–12 (Wash. 1992)). The *Hawkins* court affirmed the trial court's ruling that because "the general rule permitting release of

liability did not apply where a parent signs the contract on behalf of a minor," the release signed by Hawkins's mother on her behalf was unenforceable. *Id.* ¶¶ 6, 13.

¶28 Since the Utah Supreme Court's decision in *Hawkins,* the statute applicable in that case—the Limitations on Liability for Equine and Livestock Activities Act (the Equine Act)—has been amended to specifically "permit[] a parent to sign a release on behalf of a minor." *See Penunuri,* 2013 UT 22, ¶ 21 n.43; *see also* Utah Code Ann. §§ 78B-4-201 to -203 (LexisNexis 2012) (Equine Act); *id.* § 78B-4-203(2)(b) (permitting a parent to sign a release). Our supreme court recently recognized that *Hawkins* remains a valid example of how to determine whether a contract offends public policy when the public policy is not clearly discernible in the applicable statutes or case law. *See Penunuri,* 2013 UT 22, ¶ 28 & n.43. The court also explained that a public policy statement arrived at in the manner undertaken in *Hawkins* does not take precedence over express policy language in a controlling statute. *See id.* (indicating that, to the extent *Hawkins* conflicts with the amended Equine Act, the Equine Act controls and the conclusion in *Hawkins* is overruled).

¶29 Here, the Act includes a clear "legislative expression[] of public policy" regarding the specific industry and activities at issue; thus, we need not undertake a *Hawkins*-like public policy analysis. *See Rothstein v. Snowbird Corp.,* 2007 UT 96, ¶¶ 11, 19, 175 P.3d 560. The public policy statement in the Act provides,

> The Legislature finds that the sport of skiing is practiced by a large number of residents of Utah and attracts a large number of nonresidents, significantly contributing to the economy of this state. It further finds that few insurance carriers are willing to provide liability insurance protection to ski area operators and that the premiums charged by those carriers have risen sharply in recent years due to confusion as to whether a skier assumes the risks inherent in the sport of skiing. It is the purpose of

> this act, therefore, to clarify the law in relation to
> skiing injuries and the risks inherent in that sport, to
> establish as a matter of law that certain risks are
> inherent in that sport, and to provide that, as a
> matter of public policy, no person engaged in that
> sport shall recover from a ski operator for injuries
> resulting from those inherent risks.

Utah Code Ann. § 78B-4-401 (LexisNexis 2012). Our supreme court has interpreted this public policy statement as prohibiting pre-injury releases of liability for negligence obtained by ski-area operators from recreational skiers. *Rothstein,* 2007 UT 96, ¶¶ 16–17. And the court has outright rejected the notion that releases of liability serve the purpose of the Act—to immunize ski-area operators from liability generally—stating,

> This reasoning fails to account for the Legislature's
> inescapable public policy focus on insurance and
> ignores the reality that the Act's core purpose is not
> to advance the cause of insulating ski area operators
> from their negligence, but rather to make them better
> able to insure themselves against the risk of loss
> occasioned by their negligence.

*Id*. ¶ 17.

¶30    In other words, the Act prohibits pre-injury releases of liability for negligence entirely, regardless of the age of the skier that signed the release or whether the release was signed by a parent on behalf of a child. The Act does not differentiate among the "large number" of residents and nonresidents engaged in the sport of skiing that "significantly contribut[e] to the economy of this state" based on the participant's age. Accordingly, we reject the trial court's determination that the USSA release is unenforceable because it was signed by a parent on behalf of a minor; rather, the release is unenforceable based on the Act's policy statement.

2.      Enforceability of the USSA Release Based on Levi's Status as a Competitive or Recreational Skier

¶31     The trial court also determined that the USSA release was unenforceable in this case based on its determination that Levi was injured while engaging in recreational skiing, rather than competitive skiing. Utah courts have interpreted the Act's policy statement as prohibiting pre-injury releases signed by recreational skiers, *see Rothstein*, 2007 UT 96, ¶¶ 3, 16, while permitting pre-injury releases signed by competitive skiers, *see Berry v. Greater Park City Corp.*, 2007 UT 87, ¶¶ 18, 24, 171 P.3d 442. Here, the trial court rejected the release's enforceability by likening Levi to the recreational skier in *Rothstein*.

¶32     As previously discussed, our supreme court in *Rothstein v. Snowbird Corp.*, 2007 UT 96, 175 P.3d 560, explained that the Act was enacted in recognition that the ski industry, which plays a "prominent role in Utah's economy," was in the midst of an "insurance crisis." *Id.* ¶ 14. To achieve the Act's goal of ensuring that ski-area operators had access to "insurance at affordable rates," the Act prohibited "skiers from recovering from ski area operators for injuries resulting from the inherent risks of skiing." *Id.* ¶¶ 13, 15. The court explained that the Act was designed to strike a "bargain" with ski-area operators by freeing them "from liability for inherent risks of skiing so that they could continue to shoulder responsibility for noninherent risks by purchasing insurance." *Id.* ¶ 16. Accordingly, the *Rothstein* court concluded that "[b]y extracting a preinjury release from Mr. Rothstein for liability due to [the ski resort's] negligent acts, [the resort] breached [the Act's] public policy bargain." *Id.*

¶33     However, not long before *Rothstein*, our supreme court in *Berry v. Greater Park City Corp.*, 2007 UT 87, 171 P.3d 442, deemed a pre-injury release enforceable based on the type of skiing involved in that case. *Id.* ¶¶ 18, 24. The pre-injury release in that case was signed in favor of a ski resort by an adult prior to, and as prerequisite for, his participation in a skiercross race. *Id.* ¶¶ 2–3. The *Berry* court recognized that the vitality of Utah's ski industry

is a matter of public interest, as evidenced by the enactment of the Act, and "that most jurisdictions that permit [pre-injury] releases draw the line [of enforceability of those releases] at attempts to limit liability for activities in which there is a strong public interest." *Id.* ¶¶ 12, 17. The court then applied a six-part test to determine whether skiercross racing is an activity "in which there is strong public interest." *Id.* ¶¶ 12, 15 (citing *Tunkl v. Regents of the Univ. of Cal.,* 383 P.2d 441, 445–46 (Cal. 1963) (in bank)). The *Berry* court determined that "skiercross racing" "has simply not generated sufficient public interest either through its popularity or because of hazards associated with it to generate a call for intervention of state regulatory authority" and that it is therefore "subject to a separate analysis for the purpose of evaluating the enforceability of preinjury releases," even though "the services provided by a business operating a recreational ski area and the services provided by a business sponsoring a competitive ski race may be covered by the provisions of the Act." *Id.* ¶¶ 17–18. Accordingly, the supreme court held "that the release Mr. Berry executed in favor of [the ski resort was] enforceable." *Id.* ¶ 24.

¶34 Here, the Ski Resort asserted, and the trial court agreed, "that the critical distinction between *Berry* and *Rothstein* is that the plaintiff in *Berry* signed a release as a condition of participating in a competitive skiercross racing event, while the plaintiff in *Rothstein* was simply a recreational skier who signed a release when he purchased a ski pass." Based on that distinction and the seemingly undisputed fact as between the Ski Resort and the Rutherfords that Levi was injured during race training, the Ski Resort argued that the USSA release was enforceable under Utah law because this case "more closely resembles *Berry* than *Rothstein*."

¶35 However, the Act was amended in 2006 to expand the definition of "the sport of skiing to include participation in, or practicing or training for, competitions or special events."[12] *See* Act

---

12. Although both *Rothstein* and *Berry* were decided in 2007, long after the May 1, 2006 effective date of the amendment to the Act,

(continued...)

of March 1, 2006, ch. 126, § 1, 2006 Utah Laws 549, 549 (codified at Utah Code Ann. § 78B-4-402(1)(g) (LexisNexis 2012)). This amendment indicates the legislature's intent that competitive skiing, including practicing and training for competitions, should be treated the same way as recreational skiing.[13] *Cf. Collins v. Schweitzer, Inc.*, 21 F.3d 1491, 1493–94 (9th Cir. 1994) (holding that Idaho's similar act precludes claims brought by competitive skiers against ski resorts, particularly in light of the fact that the statute "does not distinguish between injuries suffered during racing and injuries suffered during other types of skiing"); *Brush v. Jiminy Peak Mountain Resort, Inc.*, 626 F. Supp. 2d 139, 148–49 (D. Mass. 2009) (determining that a USSA waiver was valid under Colorado law and also concluding that a Massachusetts statute requiring ski-area

---

12. (...continued)
neither case acknowledges the amended text; the only reference to the amendment was in the *Berry* court's inclusion of the 2007 supplement as part of its general citation to where the Act was codified. *See Berry v. Greater Park City Co.,* 2007 UT 87, ¶ 17, 171 P.3d 442.

13. During the Senate floor debates on the 2006 amendment to the Act, Senator Lyle Hillyard, the sponsor of the bill amending the Act, explained that the "dramatic change[s] of our skiing" industry since the Act's initial passage required that the Act be updated to "also include[] the sports of recreational, competitive, or professional skiing so that we cover not just the sport, but also the competitive and professional part." Recording of Utah Senate Floor Debates, 56th Leg., Gen. Sess. (Feb. 13, 2006) (statements of Sen. Lyle Hillyard). This and other proposed changes were intended "to make [the Act] more compatible with what the ski industry is now doing." *Id.* (Feb. 14, 2006). Senator Hillyard also noted that "there is no intention in [the proposed 2006 amendment] to exempt the negligence of the ski resort," clarifying, "We are just talking about the inherent risks when people go skiing. . . . It's just bringing the statute . . . up to date and clarify[ing its] policy and so that's what we've done is taken those words and given better definitions and more specificity." *Id.* (Feb. 13, 2006).

operators to operate their ski areas "in a reasonably safe manner" does not impose on ski-area operators a "greater duty to racing skiers than to other, perhaps less experienced, recreational skiers" because [c]ompetitive skiers . . . have the same responsibility to avoid collisions with objects off the trail as other skiers"); *Rowan v. Vail Holdings, Inc.*, 31 F. Supp. 2d 889, 901 (D. Colo. 1998) (explaining that Colorado law defines "[c]ompetitor" as "a skier actually engaged in competition or in practice therefor with the permission of the ski area operator on any slope or trail or portion thereof designated by the ski area operator for the purpose of competition" (citation and internal quotation marks omitted)); *Lackner v. North*, 37 Cal. Rptr. 3d 863, 869, 875 (Cal. Ct. App. 2006) (holding that a ski resort has no duty to eliminate or protect a recreational skier from a collision with a participant in a snowboarding race and that the resort had no duty to supervise the race participants as they warmed up on a designated training run prior to a competition). In conjunction with *Rothstein*, the amendment supports the conclusion that pre-injury releases extracted by ski-area operators from competitive skiers are also contrary to public policy.

¶36    To the extent our interpretation of the Act and its 2006 amendment may seem to be in conflict with the holding in *Berry*, we note that the plaintiff in that case was injured in February 2001, long before the Act contained the competitive-skiing exemption. Accordingly, because the Act does not contain a specific provision permitting the retroactive application of the 2006 amendment, we presume the *Berry* court abided by "[t]he well-established general rule . . . that statutes not expressly retroactive should only be applied prospectively." *In re J.P.*, 648 P.2d 1364, 1369 n.4 (Utah 1982); *see also* Utah Code Ann. § 68-3-3 (LexisNexis 2011) ("A provision of the Utah Code is not retroactive, unless the provision is expressly declared to be retroactive."). Therefore, we construe *Berry* as applying an older version of the Act and interpreting the Act as it existed prior to the insertion of the competitive-skiing exemption at issue in this case. As it applies to the Ski Resort, we determine that the USSA release is unenforceable because it is contrary to the holding in *Rothstein*, to the purpose of the Act's 2006

amendment, and to the public policy statement in the Act, all of which reject pre-injury releases executed by competitive and recreational skiers of all ages in favor of ski-area operators.

CONCLUSION

¶37　The trial court's determination that Levi was not engaged in race training at the time of his injury, especially in the face of the fact, apparently undisputed by the parties, that he was injured during racing practice, was improper in the context of the Ski Resort's motions for summary judgment. The trial court correctly denied the Ski Resort's joinder in the Ski Team's motion for summary judgment based on the Act and correctly granted the Rutherfords' related partial motion for summary judgment, based on the court's determination that there were disputed issues of material fact regarding the applicability of the machine-made snow exemption. We affirm the trial court's denial of the Ski Resort's motion for summary judgment based on the USSA release and the court's determination that the Colorado choice-of-law provision in the USSA release is inapplicable here. We agree with the trial court that the release, as it pertains to the Ski Resort, is unenforceable under Utah law, but base this conclusion on different grounds than the trial court. We remand this case for further proceedings consistent with this decision.

—————